IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| GRACEPOINTE CHURCH, | ) | C/A No. 2:06-CV-1463-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DR. KENNETH JENKINS, REV. LEON ADDISON, TONY FOLK, DR. JAMES L. HODGES, CHERYL MUSHRASH, members of the Board of Trustees for Dorchester School District Four, and RENEE MATHEWS, Superintendent of Dorchester School District Four, | ) ) ) ) ) ) ) ) | **ORDER and OPINION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**I.     Background**

Gracepointe Church ("plaintiff"), a religious organization, filed this action against the Board of Trustees for Dorchester School District Four (the "Board") and Renee Mathews, Superintendent of Dorchester School District Four (collectively "defendants"), after defendants refused to allow plaintiff to continue holding religious services at Woodland High School.  Plaintiff has used the Woodland High School facilities since August of 2005, pursuant to Dorchester School District Four's (the "School District") "Policy KF: Community Use of School Facilities," which allows "recognized nonprofit community organizations" to use school facilities. (Defs.' Resp., Ex. C.)  Defendants initially granted plaintiff permission to use the school for a three month period.  Plaintiff paid the School District $250.00 per week for the use of the school facilities and $15.00 per hour for the services of a custodian who was present at the high school as required by Policy KF.  In November 2005 defendants granted plaintiff permission to use the school

for an additional three months after the initial three-month period expired, and in January 2006 plaintiff requested permission to use the school for three more months while it was allegedly finalizing arrangements to hold services at another location.

On March 31, 2006, a representative of the School District contacted plaintiff and informed it that April 2, 2006 would be the final time plaintiff would be allowed to use the school for Sunday worship services. Plaintiff alleges that Board member Cheryl Mushrush told plaintiff's pastor that the Board did not want to set a precedent by allowing plaintiff to use school facilities for an extended period because then other "undesirable" groups such as Muslims would want to use the facilities. Plaintiff made a request to appear before a session of the Board on April 3, 2006, to ask for permission to continue using the School District facilities. The Board voted to allow plaintiff to use the school for an additional eight weeks only. The last day plaintiff was allowed to use Woodland High School was May 28, 2006.

On May 12, 2006, Plaintiff filed a complaint with the following causes of action: (i) violations of the First Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; (ii) violations of Article I, Section Two of the South Carolina Constitution; (iii) violations of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; (iv) violations of Article I, Section Three of the South Carolina Constitution; and (v) seeking a declaratory judgment pursuant to the Declaratory Judgment Act under 28 U.S.C. §§ 2201-02. Simultaneously, plaintiff filed this motion for a preliminary injunction to allow it to continue using Woodland High School for its Sunday worship services.

**II.     Discussion**

    A.     Subject Matter Jurisdiction

In their Response to plaintiff's Motion for Preliminary Injunction, defendants moved to dismiss this action under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  Specifically, defendants argue that because plaintiff has failed to exhaust all available state remedies as provided in South Carolina Code § 59-19-510, federal court is an inappropriate venue to seek review of its claims.

Section 59-19-510 provides that those aggrieved by a decision of a school district's board of trustees may appeal to the county board of education.[1]  The county board of education's decision may then be appealed to the court of common pleas.[2]

---

[1] South Carolina Code § 59-19-510 provides, in pertinent part:

> Any person aggrieved by any decision of the board of trustees of any school district in any matter of local controversy in reference to the construction or administration of the school laws . . . shall have the right to appeal the matter in controversy to the county board of education and the adverse party within ten days from the date upon which a copy of the order or directive of the board of trustees was delivered to him by mail or otherwise . . . .

S.C. Code Ann. § 59-19-510.

[2] South Carolina Code § 59-19-560 provides, in pertinent part:

> Any party aggrieved by the order of the county board of education shall have the right to appeal to the court of common pleas of the county by serving a written verified petition upon the chairman of the county board of education and upon the adverse party within ten days from the date upon which copy of the order of the county board of education was mailed to the petitioner.  The parties so served shall have twenty days from the date of service, exclusive of the date of service, within which to make return to the petition or to otherwise plead, and the matter in controversy shall be tried by the circuit judge, de novo, with or without

Defendants argue that plaintiff should have appealed the School District's decision to the county board of education before seeking judicial review.

In <u>Patsy v. Board of Regents of Florida,</u> 457 U.S. 496 (1982), the United States Supreme Court concluded that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." 457 U.S. at 516. Because plaintiff is not required to exhaust the administrative remedies set forth in South Carolina Code § 59-19-510 prior to seeking relief under § 1983, this court has subject matter jurisdiction over plaintiff's first and third causes of action alleging violations of the First and Fourteenth Amendments to the United States Constitution pursuant to § 1983. However, this court does not have subject matter jurisdiction over those causes of action that do not allege violations of § 1983. Plaintiff's second and fourth causes of action (seeking relief under the South Carolina Constitution) and its fifth cause of action (seeking a declaratory judgment) must be dismissed for lack of subject matter jurisdiction.

    B.    <u>Motion for Preliminary Injunction</u>

As the Fourth Circuit has noted, "[f]ederal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." <u>Direx Israel, Ltd. v. Breakthrough Medical Corp.</u>, 952 F.2d 802, 811 (4th Cir. 1991) (quoting <u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>, 882 F.2d 787,

---

reference to a master or special referee.

S.C. Code Ann. § 59-19-560.

4

800 (3d Cir. 1989)).  In determining whether to grant such relief, the Fourth Circuit "has consistently followed the 'hardship balancing test,'" as stated in <u>Blackwelder Furniture Co. v. Seilig Manufacturing. Co.</u>, 550 F.2d 189, 195 (4th Cir. 1977).  Under this test, four factors are considered:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
> (2) the likelihood of harm to the defendant if the requested relief is granted,
> (3) the likelihood that the plaintiff will succeed on the merits, and
> (4) the public interest.

<u>Direx</u>, 952 F.2d at 812 (quoting <u>L.J. By and Through Darr v. Massinga</u>, 838 F.2d 118 (4th Cir. 1988)).

"The irreparable harm to the plaintiff and the harm to the defendant are the two most important factors."  <u>Direx</u>, 952 F.2d at 812.  "[T]he plaintiff bears the burden of establishing that each of these factors supports granting the injunction."  <u>Id.</u> (quoting <u>Technical Publishing Co. v. Lebhar-Friedman, Inc.</u>, 729 F.2d 1136, 1139 (7th Cir. 1984)).  "Moreover, the required 'irreparable harm' must be 'neither remote nor speculative, but actual and imminent.'"  <u>Direx</u>, 952 F.2d at 812 (quoting <u>Tucker Anthony Realty Corp. v. Schlesinger</u>, 888 F.3d 969, 975 (2d Cir. 1989)).  In other words, the plaintiff must make a "clear showing" of irreparable harm.  <u>Direx,</u> 952 F.2d at 812 (quoting <u>ECRI v. McGraw-Hill, Inc.</u>, 809 F.2d 223, 226 (3d Cir. 1987)).

In considering the two most important factors,

> If it should be found that the plaintiff has made a "clear showing" of irreparable injury absent preliminary injunctive relief, the <u>next</u> step then for the court to take is to balance the "likelihood" of irreparable harm to the plaintiff [from failure to grant interim relief] against the "likelihood" of harm to the defendant [from the grant of such relief] . . . . If, after balancing those

5

> two factors [i.e., irreparable harm to plaintiff against harm to the defendant], the balance tips decidedly in favor of the plaintiff, a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation. As the balance tips away from the plaintiff, a stronger showing on the merits is required.

Direx, 952 F.2d at 812 (internal citations and quotations omitted) (emphasis in original; see also James A. Merritt & Sons, Inc. v. Marsh, 791 F.2d 328, 330 (4th Cir. 1986) ("When the balance of harms decidedly favors the plaintiff, he is not required to make a strong showing of a likelihood of success . . . ."). "This discussion clearly shows that the balance of harm evaluation should precede the determination of the degree by which the plaintiff must establish the likelihood of success on his part." Direx, 952 F.2d at 813 (citing Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 105 (6th Cir. 1982)).

### 1. Irreparable Harm

Plaintiff must show that without a preliminary injunction, it may suffer irreparable harm. Irreparable harm is "an injury that cannot be undone through monetary relief." Verbena United Methodist Church v. Chilton County Bd. of Educ., 765 F. Supp. 704, 714 (M.D. Ala. 1991). Plaintiff argues that it will not have a facility in which to conduct its worship services after Sunday, May 28, 2006. Plaintiff asserts that these activities are protected by the Free Speech and Free Exercise clauses of the First Amendment to the United States Constitution. "Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." Bronx Household of Faith v. Bd. of Educ. of New York, 331 F.3d 342, 349 (2d Cir. 2003). "The loss of First Amendment freedoms, for even minimal periods of

6

time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). Because plaintiff will be without a location to hold services after May 28, 2006, it may sustain/suffer harm if a preliminary injunction is not granted. See Deeper Life Christian Fellowship, Inc. v. Bd. of Educ. of New York, 852 F.2d 676, 679 (2d Cir. 1988) (finding irreparable harm where church would be without a place in which to conduct services for a substantial period of time).

*2.     Harm to Defendant*

Defendants allege that they will suffer harm because plaintiff's conduct subjects defendants to potential claims under the Fair Labor Standards Act (the "FLSA"), the Americans with Disabilities Act (the "ADA"), and the Establishment Clause.

a.     Potential claims under the FLSA

Under Policy KF, a School District employee must be present during after-hours use of School District Facilities. (Defs.' Resp., Ex. C.) The FLSA mandates that employees be compensated at a rate of one and a half times their regular salary if they work more than forty hours in a workweek. Defendants charge plaintiff $15.00 per hour to cover the overtime of the School District employee, Mr. Kelly, who defendants have tasked with the responsibility of being present at the school from the approved hours of 8:00 a.m. until 1:00 p.m. on Sundays. Defendants allege that plaintiff's representatives have requested on various occasions that Mr. Kelly open the school prior to 8:00 a.m. Defendants allege that Mr. Kelly has opened the school as early as 6:30 a.m. to accommodate plaintiff's needs, and they complain that plaintiff has not compensated Mr. Kelly (or any other of defendants' employees) for the extra time that he has worked.

Defendants allege that these actions subject it to potential FLSA claims for failing to pay the full amount of overtime due to a non-exempt employee. (Defs.' Resp. 13.)

While defendants argue that it is potentially subject to liability under the FLSA, any harm to defendants caused by Mr. Kelly's overtime is a direct result of defendants' own acts and/or omissions. Furthermore, any potential harm to defendants may be remedied by defendant itself by ensuring that plaintiff complies with the requirement that it fully compensate Mr. Kelly for all overtime worked.

### b. Potential claims under the ADA

Defendants also argue that plaintiff's use of the facility exposes it to potential violations of the ADA. Defendants claim that plaintiff uses a handicapped-accessible wheelchair ramp to store various items used during its Sunday worship services. Again, defendants are the author of their own "harm." The "Use of Building Contractual Agreement," signed by plaintiff's pastor, states, "All equipment brought in must be taken out at the end of service. No storage available." (Defs.' Resp., Ex. G at 4.) In order to avoid this "harm," all defendants have to do is enforce their agreement with plaintiff. As noted above, defendants cannot rely on their failure to enforce their own agreement with plaintiff establish this illusory category of "harm."

### c. Potential challenges under the Establishment Clause

Defendants claim that plaintiff's use of Woodland High School may subject them to future potential challenges under the Establishment Clause.[3] The First Amendment to

---

[3] Defendants actually state that plaintiff's conduct subjects the School District to potential claims under the "First Amendment Entanglement Clause." (Defs.' Resp. 12.) Because excessive government entanglement with religion is a violation of the Establishment Clause, this court analyzes the School District's potential liability for an

the United States Constitution, applicable to the states under the Fourteenth Amendment, prohibits the enactment of any "law respecting an establishment of religion."  U.S. Const. amend I.  Defendants allege that plaintiff: (1) intentionally obstructed the school's sign with a sign that indicated that the facility belonged to plaintiff, (2) advertised its location via flyers and pamphlets distributed throughout the community, and (3) is receiving a "subsidy" from the School District as a result of the below-market rate it is charged for the use of the school's facilities.  According to defendants, several members of the community have complained and questioned whether the School District was operating a church at Woodlands High School.  Defendants also argue that allowing plaintiff to use the premises for such a long period has rendered the facility unavailable to other groups.  Defendants are concerned that the public believes the School District endorses plaintiff's message.  Defendants state that plaintiff was asked to (and did) discontinue covering the sign at the school, but to date plaintiff distributes flyers indicating that its Sunday worship services will be held at Woodlands High School.

In Lemon v. Kurtzman, 403 U.S. 602 (1971), the United States Supreme Court established a three-part test to determine if government action violates the Establishment Clause: (1) "the statute must have a secular legislative purpose," (2) "its principal or primary effect must be one that neither advances nor inhibits religion," and (3) "the statute must not foster an excessive government entanglement with religion."  403 U.S. 602, 612 (1971).

---

Establishment Clause violation as a whole.

Under Lemon, the School District's actions are not in violation of the Establishment Clause. Plaintiff's use of Woodland High School is pursuant to the School District's secular policy of allowing "recognized nonprofit community organizations" to use community facilities. (Defs.' Resp., Ex. C.) While Policy KF does not address advertising such use, there is no evidence that the School District does not allow all organizations – both religious and secular – to publicize events held at Woodland High School. Allowing all groups that are using school facilities to distribute flyers announcing their activities does not have a principal or primary effect of advancing religion, nor does it foster excessive government entanglement with religion. Instead, allowing plaintiff to hold services at Woodland High School and to advertise these services on flyers throughout the community abides by the secular purpose of Policy KF – to allow responsible and properly organized community groups to use school facilities. Similarly, in Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Township School District, 386 F.3d 514 (3d Cir. 2004), the Third Circuit upheld a New Jersey district court's preliminary injunction allowing the Good News Club to disseminate flyers at a public elementary school advertising after-school and weekend religious activities that were held on school property. Child Evangelism Fellowship, 386 F.3d at 536. In upholding the preliminary injunction, the Third Circuit stated "[a]n entanglement must be 'excessive before it runs afoul of the Establishment Clause,' and this requires more than mere 'interaction between church and state,' for some level of interaction has always been 'tolerated.'" Id. at 534 (quoting Agostini v. Felton, 521 U.S. 203, 233 (1997)).

Defendants' argument that it is subsidizing religion by charging a "below-market rate" is also without merit. Policy KF states that "[t]he administration will set up a schedule of fees which takes into consideration the purpose of the event. Fees will be sufficient to cover operation expenses and a reasonable amount for overhead." (Defs.' Resp., Ex. C.) In Fairfax Covenant Church v. Fairfax County School Board, 17 F.3d 703 (4th Cir. 1994), the Fourth Circuit held that "[r]ather than subsidizing a church user, such a cost-recovering rent in fact provides money to the School Board to offset its ongoing expenses for school facilities." 17 F.3d at 708. All organizations that use Woodland High School are charged the same amount, and any below-market benefit is had by all groups that use the school. The School District chose what amount to charge for the use of school facilities, and if it feels that its schedule of fees is too low, it can raise the fees charged to all community organizations. Again, any "harm" to defendants is the direct result of their own actions.

### 3.     Likelihood Plaintiff will Succeed on the Merits

To be successful on its § 1983 claims, plaintiff must establish that it was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). Because the balance of harms in this case clearly favors plaintiff, it is not required to make a strong showing of a likelihood of success on the merits. See James A. Merritt and Sons, 791 F.2d at 330. "[N]evertheless, there must at least be a showing that the case raises grave or serious questions." Id.

Plaintiff argues that defendants have improperly excluded it from a limited public forum on the basis of viewpoint discrimination. The Fourth Circuit has stated:

11

> So-called "designated public fora" (often called "limited public fora") are those properties which the government has opened for expressive activity to the public, or some segment of the public. A designated public forum can be opened only to a limited class of speakers or for limited topics. Merely allowing some speech on property that is not a traditional public forum does not automatically create a designated public forum. The Supreme Court recently clarified the distinction. The government creates a designated public forum when it purposefully makes property "generally available" to a class of speakers. By contrast, the government may retain nonpublic forum status by allowing selective, permission-only access to the forum. The granting of such permission must be contingent upon non-ministerial judgments.

Warren v. Fairfax County, 196 F.3d 186, 193 (4th Cir. 1999) (internal citations omitted). Because the School District has made school facilities generally available to nonprofit community organizations for specific uses, it has created a limited public forum. See Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 390 (1993) (determining that a school district policy allowing school property to be used for designated purposes was a limited public forum).

"When the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech." Good News Club v. Milford Central School, 533 U.S. 98, 106 (2001). However, the State's power to restrict speech is not unlimited. Id. "The restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum." Id. at 106-07 (internal citations omitted).

"Two levels of First Amendment analysis are applicable to limited public fora." Warren v. Fairfax County, 196 F.3d 186, 193 (4th Cir. 1999).

> An internal standard applies and the restriction is subject to strict scrutiny 'if the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available . . . . An external standard applies if the person excluded is not a member of the group that the forum was made generally available to. Under the external

12

> standard, "the selection of a class by the government must only be
> viewpoint neutral and reasonable in light of the objective purposes served
> by the forum." The only constitutional limit placed on restrictions on
> public access in these cases is that, "once a limited forum has been
> created, entities of a 'similar character' to those allowed access may not
> be excluded."

Amercian Civil Liberties Union v. Mote, 423 F.3d 438, 444 (4th Cir. 2005) (internal citations omitted).

Rather than allowing selective, permission-only access to school facilities, Policy KF allows all "responsible and properly organized community groups to use school facilities" subject to some general rules. (Defs.' Resp., Ex. C.) Plaintiff is a "recognized nonprofit community organization" that falls within the class of community groups to which Woodland High School has been made generally available.

Plaintiff claims that defendants' decision to deny plaintiff continued use of Woodland High School or any other facility of the School District was based on intentional viewpoint discrimination. (Compl. ¶ 34.) Defendants argue that plaintiff should not be allowed to continue using the school facilities because Policy KF is a short-term use agreement that is not intended to provide any organization a long-term use of School District facilities. (Defs.' Resp. 17.) According to defendants, their decision to deny plaintiff's request to continue using Woodland High School was based on their desire to ensure a consistent application of Policy KF to all community groups. (Defs.' Resp. 15.)

Policy KF does not address time limitations for the use of school facilities. At the same time, it addresses use of the school facilities by community organizations in singular terms, such as "activity" and "event." (Defs.' Resp., Ex. C.) Defendants argue

that because Policy KF does not contemplate long-term use of school facilities by community organizations, its decision to deny plaintiff's application was not viewpoint discrimination.

Plaintiffs are correct that they are entitled to use the School District's facilities to the same extent that any other nonprofit community organization is entitled to use the property, see, e.g., Good News Club, 533 U.S. at 112 (holding that allowing a religious club to hold meetings on public school property does not violate the Establishment Clause). Accordingly, this case may turn on whether a secular community organization would have been allowed to continue leasing the property for a long period of time. As support for their argument that Policy KF is for short-term use of school facilities only, defendants have attached a number of applications for the use of School District facilities which the School District granted. (Defs.' Resp., Ex. H.) However, this court has no way of knowing whether these applications represent a portion of the events allowed by the School District or whether defendants have submitted every application. Policy KF states that it was issued in August, 2000 (Defs.' Resp., Ex. C.); the earliest application attached by defendants is from 2004. It is possible that defendants could have allowed a community organization to use school facilities on a long-term basis in the past, but have not included the application as an exhibit. This is a matter which will probably be addressed during discovery.

Additionally, several of the applications that were granted show uses that are outside the scope of uses described by Policy KF. For example, the Board of Trustees has approved multiple applications by Morris Chapel Youth Department to use the gym at Harleyville-Ridgeville Elementary for fund-raisers (Defs.' Resp., Ex. H at 19, 28),

despite the fact that Policy KF states "[n]on-school groups may not use the school facilities for money-raising events."[4] (Defs.' Resp., Ex. C.) Defendants also included an application granted to an individual (Defs.' Resp., Ex. H at 3), in violation of Policy KF's instruction: "The board restricts the use of facilities to recognized nonprofit community organizations" (Defs.' Resp., Ex. C). The fact that defendants may not have strictly adhered to Policy KF supports the inference that they may have been flexible in the application of Policy KF in other ways as well.

Given Fourth Circuit precedent that a strong showing of likelihood of success on the merits is not required when the harm to the plaintiff clearly outweighs the harm to the defendant, this court concludes that plaintiff "has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Blackwelder, 550 F.2d at 195.

### 4.     *Public Interest*

This court is satisfied that an injunction allowing plaintiff to continue using Woodland High School, subject to the limitations described therein, would not be adverse to the public interest.

### C.     Conditions for Preliminary Injunction

Defendants are enjoined from denying plaintiff's use of Woodland High School for plaintiff's Sunday worship services until a final decision on the merits is entered,

---

[4] Dorchester School District Four's "Application for Use of School Property" (the "Application") seems to conflict with Policy KF. Policy KF provides, "Non-school groups may not use school facilities for money-raising events." (Defs.' Resp., Ex. C.) The Application states, "If purpose of program is fund raising, applicants [sic] signature below is an assurance that all funds, above costs, will be used solely for recognized charitable purposes." (Defs.' Resp., Ex. H.)

subject to the following limitations:

> 1) Plaintiff must comply with the terms and conditions of Policy KF regarding payment and use. Specifically, plaintiff may only use the school's facilities between the approved hours of 8:00 a.m. and 1:00 p.m., plaintiff must get additional approval for any time before or after those hours, and plaintiff must compensate the school employee present for the entire time that it uses the facilities.
>
> 2) Plaintiff must remove all of its property from the school's premises each week and may not store anything on the wheelchair ramp at Woodland High School.

The parties should note that this case will be called for trial after October 1, 2006, and counsel should present the court with a scheduling order within 10 days of receipt of this Order which reflects this potential trial date.

### III.    Conclusion

For the reasons stated above, it is therefore, **ORDERED** that plaintiff's motion for a preliminary injunction be **GRANTED**. Additionally, plaintiff's second, fourth, and fifth causes of action are **DISMISSED**, without prejudice.

**AND IT IS SO ORDERED**.

_____
**David C. Norton**
**June 8, 2006**                              **United States District Judge**
**Charleston, South Carolina**

16